# In the U.S. Court of Federal Claims

|  |  |  |
|---|---|---|
| BRANDT DEVELOPMENT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.___25-284_____ |
| | ) | |
| v. | ) | Judge ___C. Lerner_____ |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

## AMENDED BID PROTEST
## AMENDED BRIEF IN SUPPORT OF BID PROTEST

---

Now comes Plaintiff, Brandt Development, with following Amended Bid Protest; Amended Brief in Support of Bid Protest.

Defendant: United States

Client Agency: Air Force Research Laboratory (AFRL)
Bid Contract Number: BAA FA8650-17-S-2002
Enabling Technologies for High-Speed Operable Systems (ETHOS) CALL 003, Amendment 02

Expendable Hypersonic Multi-mission ISR and Strike (Mayhem)

Received - USCFC

APR 1 0 2025

Contract Instrument:

Brand Development presents following Amended Bid Protest contesting the award of the 2022 Expendable Hypersonic Multi-mission ISR and Strike (Mayhem) to Leidos, and the Leidos / Kratos / Calspan / Draper Lab team.  Plaintiff confirms this is a non-tort action.

Plaintiff confirms this bid protest is not over a single task order that has been completed and ending the Leidos Team services.  The bid protest is over a Leidos team contract that is still ongoing.  Plaintiff refers the Court to the AFLR's own words through the AFRL's interview with journalists Howard Altman, and Joseph Trevithick, published on February 17th, 2024:

> "The "Mayhem program will complete the first task order, this year, on the current contract at the conclusion of the Conceptual Design Review/System Requirements Review [CoDR/SRR]," AFRL spokesman Bryan Ripple told *The War Zone* earlier this week.
>
> "AFRL is neither terminating the initial task order nor the Indefinite Delivery, Indefinite Quantity (IDIQ) contract," Air Force Col. Aaron Tucker, the High Speed Systems Division Chief at AFRL's Aerospace Systems Directorate, stressed to us in response to follow-up questions. "The initial task order will be fulfilled with a conceptual design review."

"In addition, "although AFRL is not terminating the existing contract with Leidos, the operational pull is not clear enough to warrant significant investment to launch and deliver a more complete design package suitable for an acquisition program," according to AFRL spokesman Ripple.  That being said "AFRL may seek to add additional task orders to the Leidos contract in the future."  (Altman & Trevithick, 2024)

This contradicts the U.S. Government's lead counsel's frivolous and false claims that this contract has ended or has been terminated.  AFLR spokesmen Bryan Ripple and Col. Aaron Tucker have clearly set the record straight that the Leidos team contract is ongoing and will receive future funding.

The AFRL's published Mayhem Solicitation and published interview statements with

journalists Altman and Trevithick showing conflicting and quickly changing or evolving descriptions of what exactly the Leidos Team contract is. Both the Mayhem Solicitation and the AFRL's interview with journalists Altman and Trevithick violate FAR regulations which require a specific and set contract instrument that is not allowed to change. The AFRL is ignoring these FAR regulations and playing Calvinball with a critical military contract vehicle that is associated with National Security. The U.S. Government cannot conduct a proper audit of the AFLR's actions in the Mayhem contract as the AFRL team keeps moving the goal posts.

Plaintiff also confirms this AFRL Mayhem solicitation is not a delivery order, as delivery orders are for supplies. This AFRL solicitation is for Research and Development. Plaintiff submits following description published in the AFRL Mayhem solicitation:

"Program Description: Air Force Research Laboratory, Aerospace Systems Directorate, High Speed Systems Division, AFRL/RQH is soliciting proposals for research and development (R&D) expertise for the Mayhem program."

Plaintiff refers the Court to the contract/instrument described under the issued AFRL Mayhem solicitation:
"Type of Contract/Instrument: The Air Force reserves the right to award the instrument best suited to the nature of research proposed. Accordingly, the Government may award any appropriate contract type under the FAR or Other Transaction (OT) for Prototype, Grant, Cooperative Agreement, or OT for Research.The Air Force may also consider award of an appropriate technology transfer mechanism if applicable."

In short, the AFLR did not know what type of contract or instrument this solicitation would be during the procurement phase, based on their own publishment of the contract/instrument description. A reasonable party would not be able to ascertain if it was a single task order contract, an IDIQ contract, a delivery order, or other contract instrument to the successful bidder.

Plaintiff refers the Court to written communications Brandt Development has received from the U.S. Government lead counsel on March 10th regarding this bid protest:

"Further, the task order that is the subject of this protest has ended, and the agency has conveyed that no other task orders will be awarded. Because this protest has been made in connection with the issuance of a specific task order, it is barred by the Federal Acquisition Streamlining Act (FASA) *22nd Century Techs., Inc. v. United States*, 57 F.4th 993, 998-99 (Fed. Cir. 2023) ("Congress expressly limited the Claims Court's jurisdiction in the context of protests to task or delivery orders").

The Government's lead counsel has provided false information and has applied a FASA statute to Plaintiff's bid protest that does not apply to the contract vehicle in the Mayhem project or any of the facts in Plaintiff's bid protest. The Leidos "task order" has not ended and the AFRL is planning on issuing additional task orders or other contract instruments to Leidos under the Mayhem project as evidenced by AFRL spokesmen Bryan Ripple and Col. Aaron Tucker's interview and published statements with journalists Altman and Trevithick. Plaintiff has provided adequate findings of facts to show that this bid protest has not been made in connection with the issuance of a specific task order. FASA does not apply in these conditions.

Plaintiff presents a valid legal argument in the bid protest of improper actions during a military contract procurement phase (otherwise known as bid phase). Misconduct and failure to following FAR regulations and federal laws during a procurement or bid phase is exactly what the U.S. Court of Federal Claims is tasked with reviewing in all bid protest cases.

Issue Presented: U.S. Court of Federal Claims jurisdiction over Plaintiff's bid protest.

In regards to previous Court comments that the Court may not have jurisdiction over Plaintiff's Bid Protest containing non-tort claims, Plaintiff refers the Court back to the legal research of jurisdictional issues of the U.S. Court of Federal Claims by the Honorable Gregory Sisk:

"Over the past decade, the U.S. Court of Appeals for the Federal Circuit has issued a series of opinions clarifying the jurisdictional priority of the United States Court of Federal Claims (CFC) under the Tucker Act (which authorizes non-tort money claims against the United States) over a variety of claims against the federal government that are essentially means to a monetary end. In these cases, plaintiffs had cleverly or mistakenly transformed financial disputes into requests for injunctive or declaratory relief under the Administrative Procedure Act (APA) that purportedly could be filed in U.S. District Court. Because the APA expressly excludes judicial review in District Court when an "adequate remedy" lies in another court, the Federal Circuit has repeatedly confirmed that the CFC retains its traditional and exclusive jurisdiction to hear claims against the federal government that are adequately remedied by a money judgment. The Federal Circuit's leading jurisdictional decisions, emphasizing the sufficiency of a money judgment in the CFC to resolve claims that are essentially pecuniary in nature, have arisen in such varied contexts as an objection by nuclear utilities to government assessments for costs in decontaminating uranium processing facilities; a claim by a federally subsidized, low-income housing project that the government breached a contract by refusing to permit adequate rental increases, which in turn led to foreclosure on the housing project's federally insured mortgage; and efforts by a lender to force assignment to and obtain reimbursement from the government on a defaulted nursing home mortgage under a federal mortgage guarantee program." (Sisk, Gregory, 2013)

"In light of these judicial developments, attempted detours from the CFC in cases arising from monetary disputes with the federal government—in Indian breach of trust cases or otherwise—should be coming to an end."

"What today is known as the United States Court of Federal Claims "shared its birth with that of the first significant grant of permission by the sovereign United States to its citizens to seek relief against it in the courts." In 1855, Congress created the United States Court of Claims and gave it authority to hear claims against the United States founded upon federal statutes, regulations, and contracts. In 1887, the Tucker Act was enacted to confirm the nationwide jurisdiction of the Court of Claims over money claims (other than in tort) based on federal statutes, executive regulations, and contracts, while also expanding the court's authority to include monetary actions based on the Constitution."

"In 1982, through the Federal Courts Improvement Act, Congress divided the original Court of Claims into two related entities: (1) the Claims Court, which henceforth would serve as the trial forum for Tucker Act and certain other claims against the federal government, including government contract claims; and (2) the United States Court of Appeals for the Federal Circuit, which would be the appellate court with jurisdiction over Tucker Act case appeals generally and over cases from the Claims Court specifically."

"The Tucker Act is a jurisdictional statute that also waives the federal government's sovereign immunity from suit and authorizes monetary claims "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Trial court jurisdiction over "Big" Tucker Act claims against the United States is assigned by § 1491(a)(1) to the CFC. District Courts retain concurrent jurisdiction over Tucker Act claims for $10,000 or less under § 1346(a)(2), which is commonly known as the "Little" Tucker Act."

"The Tucker Act remains the "foundation stone" in the adjudication of non-tort money claims against the United States. Congress has designated the CFC as the forum for demands against the public treasury, relying on its expertise with appropriations and other money-mandating statutes and its experience in adjudicating complex cases involving fiscal matters, financial transactions, and public monetary obligations. Among those matters falling under the purview of the CFC are government contract formation issues."

"Traditionally, the CFC was understood to have authority to award only monetary relief against the United States. In recent decades, Congress has granted to the CFC meaningful and considerable, although limited, remedial powers beyond awarding a money judgment. Most importantly for present purposes, in 1972, Congress enacted the Remand Act as an amendment to the Tucker Act, authorizing the CFC "[t]o provide an entire remedy and to complete the relief afforded by the judgment" by granting certain equitable-type relief attached to a money judgment, including "correction of applicable records." Thus, when a plaintiff has a meritorious claim for a money judgment, the CFC also has the remedial power to grant certain non-monetary relief that is "incident of and collateral to" the money judgment."

Procurement Phase Activities:

Brandt Development was the low bidder on the 2022 Expendable Hypersonic Multi-mission ISR and Strike (Mayhem). The Air Force COR rejected Brandt's low bid for an improper technicality that has no legal basis to warrant rejection of the RFP's low bid proposal. This contract was then improperly awarded to the Leidos / Kratos / Calspan / Draper Lab team at an excessive and unjustified cost of $334 million. Brandt's proposal was at $208,540,464 million.

Plaintiff, Brandt Development, will address both the Contracting Officer's Agency Level Protest Dismissal position, dated 30 October 2024, and the Independent Review dated November 20th 2024 position that "protest of the award is untimely. In accordance with FAR 33.103(e), Protests based on alleged apparent improprieties in a solicitation shall be filed before bid opening or the closing date for receipt of proposals. In all other cases, protests shall be filed no later than 10 days after the basis of protest is known or should have been known, whichever is earlier. Your protest was received on 5 October 2024 on a contract awarded 16 December 2022."

This improper conclusion by both the AFLR Contracting Officer and the Independent Reviewer stem from the fact that neither one of these officials are a licensed attorney, and neither one has any experience in contract law, FAR regulations, federal rules of civil procedure, or any of the federal court rulings that already address the issue of timely filings in contract disputes. Federal courts have already established precedent on this issue or argument and the AFLR Contracting Officer and Independent Reviewer have no knowledge or basic understanding of established federal courts precedent on this issue. AFRL staff and officials involved in denial of Brandt's bid protest continuously stated the denial was based on FAR regulations, but did not have sufficient knowledge of FAR regulations or how to properly interpret FAR regulations.

Brandt presents the following established federal court rulings precedent on "untimely protests".

Concerning the Contracting Officer and Independent Reviewer position on alleged untimely submission of contract award protest, Plaintiff will refer the Court back to federal mandated

Discovery Rules and/or Equitable Tolling. This involves the time a Contractor has to protest a contract award begins at the time of discovery by the Contractor of insufficiencies, fraud, contractual errors, bid submission errors, or any other factor that contributes to a contract protest.

Further, the statute of limitations does not begin until immediately upon discovery of a contract violation by a Contractor. The toll period on protest of Leidos' contract violations did not begin until Brandt Development discovered the violations immediately prior to sending the contract dispute letter to the Air Force on October 5th, 2024. Plaintiff has met the FAR deadline for launching a contest of the Leidos' contract award and would prevail on appeal. It is improper and unethical for Leidos to take large amounts of money from the military or government and just provide them with cartoonish AI generated renderings and no real work product as required by the contract itself. It is unethical and unfair to all the other bidders who know better than to engage in such fraud against the government. Contractors cannot ChatGPT their way to $334 million in payments from the Air Force.

41 U.S.C. 2106

The Fraud-Based Discovery Rule—Distinguished from Equitable Tolling and the General Discovery Rule

Distinct from the question as to whether the limitations period generally runs from discovery is the fraud-based discovery rule that applies even if the limitations period generally runs from the violation and not discovery of the violation. Justice Ginsburg's separate opinion in *Rotkiske v. Klemm*,140 S. Ct. 355 (2019) discusses the fraud-based discovery rule at some length. She finds "the rule governs if either the conduct giving rise to the claim is fraudulent, or if fraud infects the manner in which the claim is presented." *Id.* at 365.

Justice Ginsburg distinguishes the fraud-based discovery rule from equitable tolling. Equitable tolling pauses or "tolls" a statutory limitations period after it has commenced. A party qualifies for equitable tolling only if they establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 363, citing *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016).

Justice Ginsburg indicates that the fraud-based discovery rule sets the time at which a claim accrues, i.e., the time when the statute of limitations commences to run. When a plaintiff is injured by fraud, the bar of the statute does not begin to run until the fraud is discovered. *Id.*, citing *Merck & Co v. Reynolds*, 559 U.S. 633, 644–645 (2010).

A statute of repose may be extended through tolling. One way to toll the statute of repose is by proving fraudulent concealment or equitable estoppel such that it would be inequitable to allow a party to benefit from their concealments or misrepresentations. In this case, the appellate court held that although the statute of repose would have expired for the plaintiff's claims, the statute was tolled based on the defendants' constant reassurances that the opt-out Notice was compliant.

Air Force officials in the Leido contract case have been consistently assuring Brandt and all other bidders that the Leidos bid and Leidos team have been compliant with federal statutes and FAR regulations. This was not true. They have not been compliant. Air Force reassurances to Brandt and all bidders was unsupported by the facts of this case and resulted in fraud committed upon all of the bidders of this contract, including Brandt.

§2106. Reporting information believed to constitute evidence of offense

A person may not file a protest against the award or proposed award of a Federal agency procurement contract alleging a violation of section 2102, 2103, or 2104 of this title, and the Comptroller General may not consider that allegation in deciding a protest, unless the person, no later than 14 days after the person first discovered the possible violation, reported to the Federal agency responsible for the procurement the information that the person believed constitutes evidence of the offense.

A cause of action may still be tolled if a plaintiff can plead facts sufficient to show fraudulent concealment and equitable estoppel. A plaintiff must plead sufficient facts to demonstrate that the plaintiff delayed filing suit based on a defendant's constant reassurances of the legal soundness, sufficiency, and compliance of the plaintiff's actions despite the defendant's knowledge to the contrary.

The discovery rule delays the commencement of the limitations period where the plaintiff does not know he has been injured because the injury is undiscoverable. Brandt Development did not know that they had sustained an injury by the award of the Leidos contract until October of 2024. Equitable tolling, by contrast, pauses an already-commenced limitations period where the plaintiff knows he has been injured and is diligently pursuing his rights but for some good reason does not file his suit on time. Where the victim of an injury does not know he has been injured, he has not been pursuing his rights diligently, or indeed at all, because he has not yet discovered that his rights have been violated.

In causes of action premised on fraud, courts have always delayed the start of the limitations period until the victim discovers or reasonably should discover that he has been injured.

The oft-stated rationale for this rule was the one expressed by Justice Story—to prevent wrongdoers from benefiting from their own wrongs. The rule "is founded in a sound and philosophical view of the principles of the statutes of limitation," the Court reflected in Bailey, 88 U.S. at 349. "To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure." Id. As one of the commentators explained, "the defendant is not to be permitted to avail himself of his own fraud by successfully setting up the statute [of] limitation[s] to defeat the plaintiff's claim." Buswell, Statute of Limitations, 548.

The traditional doctrine delaying the start of the limitations period in cases of undiscoverable fraud applied to all statutes of limitations, without regard to differences in their text. Courts and commentators drew no distinction between "occurrence" statutes and "accrual" statutes, because the rationale for the doctrine did not depend on the precise wording of the statute. Rather, the rationale was the principle that a person should not profit from his own fraud.

For example, in Exploration Co. v. United States, 247 U.S. 435, 445 (1918), the Court considered a limitations period that began with "the date of the issuance of such patents." To use the Court of Appeals' terminology, this was an "occurrence rule." Nevertheless, this Court held

that "the true rule is established in federal jurisprudence by the decision of this court in Bailey v. Glover," id. at 446, "that for the purpose of such statutes the cause of action did not accrue until the discovery of the fraud," id. at 447. The Court explained "that such was the undisputed doctrine of courts of equity, and that the weight of authority, English and American, applied the same rule to actions at law." Id.

The Court of Appeals held that the discovery rule delays the commencement of the limitations period where the plaintiff does not know he has been injured because the injury is undiscoverable. Charles Alan Wright et al., Federal Practice & Procedure § 1056 (4th ed. Westlaw) (text at nn. 43-44).

The military and the government should adhere to the traditional principle that where a statute is silent on the subject, in causes of action based on fraud the limitations period does not begin until the party discovers or should reasonably discover that he has been injured.

Issue Presented: Improper Review of Brandt Protest of Leidos Contract Procedures:
Brandt had not previously provided any documents for the Independent Reviewer to evaluate. Brandt simply asked the AFRL Contracting Officer on the referenced contract for the contact information and process information to begin the Independent Review. Please be aware the Contracting Officer failed to provide this information to Brandt, and improperly sent an Air Force official a request to start and complete an independent Review without following FAR regulations and contracting protocol. Brandt had not even prepared any protest documents for the Independent Reviewer and was not aware of or notified that this activity was occurring. Please see Brandt's Oct. 30th email to the Contracting Officer below:

Jay Smith
From:contactjaysmith@yahoo.com

To: COOK, JOSEPH A CIV USAF AFMC
AFRL/RQKPA,kathy.lauden.1@us.af.mil,afrl.pk.workflow@us.af.mil,afrl.pzl.divisionfog@us.af
.mil,charles.brink@us.af.miland 1 more...

Wed, Oct 30 at 4:52 PM

Contracting Team: FAR 33.103(d)(2)(viii) does not list any deadline guidelines or amount of time a Contractor has to protest an award. This section does not provide any information to base a protest denial due to a time issue. This was the wrong section to refer a Contractor and other Contracting Team members to and should be disregarded by the entire Contracting and Project Team.

FAR Section 33.103 d (4) provides the Contractor the right to request any contract protest review at the higher level.

Brandt Development formally requested this independent review from the AFLR Contracting Officer. Appellant formally requested that the Contracting Officer provide Brandt Development with the Independent Reviewer contact name and communication process for this FAR requirement. AFLR Contracting Officer ignored Appellant's request and refused to provide this Independent Reviewer information and process. AFLR CO simply sent Appellant a vague and generic Independent Reviewer response after the review was completed.

"33.103 d (4) In accordance with agency procedures, interested parties may request an independent review of their protest at a level above the contracting officer."

Further the Contracting Officer failed to follow even the most basic of FAR regulations during his poor treatment of Brandt Development and their concerns. The Contracting Officer failed at the following FAR requirements and did not attempt to comply with any of them:

(b) Prior to submission of an agency protest, all parties shall use their best efforts to resolve concerns raised by an interested party at the contracting officer level through open and frank discussions.

(c) The agency should provide for inexpensive, informal, procedurally simple, and expeditious resolution of protests. Where appropriate, the use of alternative dispute resolution techniques, third party neutrals, and another agency's personnel are acceptable protest resolution methods.

(4) In accordance with agency procedures, interested parties may request an independent review of their protest at a level above the contracting officer; solicitations should advise potential bidders and offerors that this review is available. Agency procedures and/or solicitations shall notify potential bidders and offerors whether this independent review is available as an alternative to consideration by the contracting officer of a protest or is available as an appeal of a contracting officer decision on a protest. Agencies shall designate the official(s) who are to conduct this independent review, but the official(s) need not be within the contracting officer's supervisory chain. When practicable, officials designated to conduct the independent review should not have had previous personal involvement in the procurement.

Note that the Contracting Officer and Independent Reviewer failed to comply with the FAR regulations listed above that allows for reviews of protests allegedly not timely filed. The Independent Reviewer is also part of the AFRL supervisory chain, which should have prevented this official from conducting an independent review.

g) Agencies shall make their best efforts to resolve agency protests within 35 days after the protest is filed. To the extent permitted by law and regulation, the parties may exchange relevant information.

(h) Agency protest decisions shall be well-reasoned and explain the agency position. The protest decision shall be provided to the protester using a method that provides evidence of receipt.

The AFLR Contracting Officer did not complete any of the tasks listed above.

The AFLR Contracting Officer did not provide any well-reasoned decision, as he is unaware and inexperienced in FAR regulations and federal court rulings on the Discovery Rule and Tolling statutes.

Plaintiff presents the following FAR regulations that the AFLR Contracting Officer and the Independent Reviewer are required by federal statues to complete regardless of whether it is associated with a contract protest or other communications received that are not associated with a contract protest. They have both failed in complying with these FAR regulations:

33.209 Suspected fraudulent claims.

If the contractor is unable to support any part of the claim and there is evidence that the inability is attributable to misrepresentation of fact or to fraud on the part of the contractor, the contracting officer shall refer the matter to the agency official responsible for investigating fraud.

The AFLR Contracting Officer accepted a higher bid from Leidos and the Leidos team at an artificially high price and illegally ignored the low bid from Brandt Development. The Contracting Officer then awarded the IDIQ contract to Leidos, who was not the low bidder, to the detriment of all bidders submitting bids with the intention of providing a real work product. Leidos did not.

Appellant maintains that the AFLR Contracting Officer's omission or suppression from Brandt of the Independent Reviewer and review process is intentional and was clearly not a mistake or misunderstanding or oversight. The Contracting Officer is prohibited by law from attempting to block Contractors from the review and appeal process.

The AFLR Contracting Officer's lack of knowledge of FAR regulations, the CO's inexperience, the CO's constant misinterpretation of multiple sections of FAR regulations, the unethical and illegal denial of critical information and documents to Brandt during the bid phase, the clear discrimination by the Contracting Officer against Brandt, a WBE Woman-Owned company, and the failure of the Contracting Officer to comply with FAR regulations associated with treatment of minority bases businesses bidding these projects are grounds for immediate removal of the Contracting Officer from all decisions regarding this military project. The AFLR Contracting Officer is not capable of correctly interpreting and applying FAR regulations and associated federal laws. This is having a negative impact on small businesses and woman owned businesses participating in the AFLR bid procurement process.

Brandt is a Woman Owned Business (WBE), Woman-Owned Small Businesses (WOSB), and has been treated unethically and improperly by this AFLR Contracting Officer since Brandt entered the bidding process in 2022. This disparaging treatment of minority or women-owned

contracting businesses cannot continue as it undermines the entire Air Force contracting program. From the procurement phase through the current dispute process, the Contracting Officer keeps critical information close to the vest and does not voluntarily offer this critical information to Brandt Development. The Contracting Officer's communications with Brandt Development are intentionally vague and incomplete, resulting in a negative impact to Brandt's role in the bid procurement process. The Contracting Officer's intentional withholding of information from Brandt, while providing this information to other bidders is unethical and unconscionable. This is not what the military and government intended for Woman-Owned Businesses to endure. It is sexist and misogynist. This is appalling behavior. It is 2025, not 1974. Women-Owned businesses have rights, and this AFLR Contracting Officer is doing whatever he can to block those rights and prevent this Woman-Owned Business from succeeding.

**19.202-4 Solicitation.**

The contracting officer shall encourage maximum response to solicitations by small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small, disadvantaged business, and women-owned small business concerns by taking the following actions:

(a) Allow the maximum amount of time practicable for the submission of offers.

(b) Furnish specifications, plans, and drawings with solicitations, or furnish information as to where they may be obtained or examined.

(c) Provide to any small business concern, upon its request, a copy of solicitations with respect to any contract to be let, the name and telephone number of an agency contact to answer questions related to such prospective contract and adequate citations to each major Federal law or agency rule with which such business concern must comply in performing such contract other than laws or agency rules with which the small business must comply when doing business with other than the Government.

**19.202-1 Encouraging small business participation in acquisitions.**

Small business concerns shall be afforded an equitable opportunity to compete for all contracts that they can perform to the extent consistent with the Government's interest. When applicable, the contracting officer shall take the following actions:

(a) Divide proposed acquisitions of supplies and services (except construction) into reasonably small lots (not less than economic production runs) to permit offers on quantities less than the total requirement.

(b) Plan acquisitions such that, if practicable, more than one small business concern may perform the work, if the work exceeds the amount for which a surety may be guaranteed by SBA against loss under 15 U.S.C. 694b (see definition of "Applicable Statutory Limit" at 13 CFR 115.10).

(c) Ensure that delivery schedules are established on a realistic basis that will encourage small business participation to the extent consistent with the actual requirements of the Government.

**19.202-1 Encouraging small business participation in acquisitions.**

Small business concerns shall be afforded an equitable opportunity to compete for all contracts that they can perform to the extent consistent with the Government's interest. When applicable, the contracting officer shall take the following actions:

(a) Divide proposed acquisitions of supplies and services (except construction) into reasonably small lots (not less than economic production runs) to permit offers on quantities less than the total requirement.

(b) Plan acquisitions such that, if practicable, more than one small business concern may perform the work, if the work exceeds the amount for which a surety may be guaranteed by SBA against loss under 15 U.S.C. 694b (see definition of "Applicable Statutory Limit" at 13 CFR 115.10).

**19.202-2 Locating small business sources.**

The contracting officer shall, to the extent practicable, encourage maximum participation by small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns in acquisitions by taking the following actions:

(a) Before issuing solicitations, make every reasonable effort to find additional small business concerns (see 10.002(b)(2)). This effort should include contacting the agency small business specialist and SBA PCR (or, if a PCR is not assigned, see 19.402(a)).

(c) Provide to any small business concern, upon its request, a copy of solicitations with respect to any contract to be let, the name and telephone number of an agency contact to answer questions related to such prospective contract and adequate citations to each major Federal law or agency rule with which such business concern must comply in performing such contract other than laws or agency rules with which the small business must comply when doing business with other than the Government.

Literally none of the regulations listed above were completed or even attempted by the AFLR Contracting Officer.

Plaintiff refers the Court to U.S. Code, court rulings, and opinions regarding procurement activities:

The actions of the Air Force can be set aside if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.
*Kentron Hawaii v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973).

Post Bid Procurement Activities:
The AFLR Contracting Officer is participating in the distribution of millions of dollars in federal funds in monthly payments to Leidos and associated companies under this contract while not

receiving any work product of any value or work product that complies with the executed contract. The federal government and Air Force did not set aside millions of dollars for this project just to pay Leidos for AI generated cartoon renderings that are useless. Leidos never produced an actual design for this project as contracted to do. This is fraud and a clear case of money laundering.

It has been two years since the contract award and Leidos has not provided the U.S. military with any work product of value despite having been paid approx. $334,000,000. Leidos has only provided the U.S. military with frivolous AI generated elementary conceptual designs created on a computer of a missile that they have no idea how to construct. The conceptual designs created by Leidos are of no use or value to any party. Leidos designs are AI generated photos (possibly ChatGPT software generated) that have no place in this Mayhem contract. This is blatant fraud and misuse of military funds. Leidos was not audited or vetted over the past two years and it clearly shows. Leidos has also failed to meet the contract deadlines and terms. Brandt asks for the Leidos contract to be terminated for cause, and awarded to the low bidder, Brandt Development, as allowed by FAR regulations. Brandt Development further asks for the $334,000,000 to be "clawed back" from the Leidos team by the U.S. Government.

Brandt Development was the low bidder on the 2022 Expendable Hypersonic Multi-mission ISR and Strike (Mayhem). The Air Force COR rejected Brandt's low bid for an improper technicality that has no legal basis to warrant rejection of the RFP's low bid proposal. This contract was then improperly awarded to the Leidos / Kratos / Calspan / Draper Lab team at an excessive and unjustified cost of $334 million. Brandt's proposal was at $208,540,464 million.

An Air Force contract can be terminated for cause if the contractor fails to meet contract terms or conditions, or if they default on the contract. The government may also terminate a contract for cause if the contractor doesn't provide adequate assurances of future performance.

Leidos has violated their contract terms and failed to provide the U.S. Military with the product and services as described in the RFP issued over the referenced project.

Plaintiff has stated claims upon which relief could be granted. Plaintiff's bid protest and complaint satisfies the pleading standard of Rule 8 of the Federal Rules of Civil Procedure. Plaintiff, Brandt Development, is entitled to relief. Plaintiff certifies that there is a plausible basis for the Court to provide a remedy to the Plaintiff, and that the facts alleged demonstrate a right to relief under the law. Plaintiff has presented sufficient facts which, if taken as true, would indicate that a violation of laws had occurred or that the claimant was entitled to a legal remedy.

Prayer for Relief:

Plaintiff requests that the Leidos Team IDIQ contract be terminated for cause and a new contract issued to Plaintiff, Brandt Development as the true low bidder in this IDIQ Solicitation.

Plaintiff requests compensation in the amount of the Brandt Development bid submitted for this RFP.

Plaintiff requests the U.S. Government "claw back" the approx. $334,000,000 paid to the Leidos team.

Plaintiff requests that the Court halt any further fraud, money laundering, racketeering, misuse of federal funds attempts by the Air Force Research Laboratory division and any other parties conspiring with this AFRL Division's staff.

Plaintiff requests full access to the U.S. Court of Federal Claims PACER portal electronic filings in this bid protest.

Plaintiff prays for General Relief.

Submitted by Brandt Development,

*Gary Smith*

Brandt Development
2108 Monarch Drive
Austin, Texas 78748

Phone: 512-317-7650

Citations:

Winter 2013. T*he Jurisdiction of the Court of Federal Claims and Forum Shopping in Money Claims Against the Federal Government.* Gregory C. Sisk. University of St. Thomas School of Law (Minneapolis).

## CERTIFICATE OF SERVICE

On the _29_ day of March, 2025, Plaintiff filed Plaintiff's Amended Bid Protest and Amended Brief in Support of Bid Protest with the clerk of the court for the U.S. Court of Federal Claims. Amended Bid Protest filing was sent to the Court Clerk by certified mail. Plaintiff hereby certifies that she is serving the following documents on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5 (b)(2) beginning March _29_, 2025:

Plaintiff's Amended Bid Protest/Amended Brief in Support of Bid Protest

_Janeen Smith_

Signature

Janeen Smith
Brandt Development
2108 Monarch Drive
Austin, Texas 78748

1

Janeen Smith
2108 Monarch Drive
Austin, Texas 78748



RECEIVED

APR 1 0 2025

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

U.S. Court of Federal Claims
Attn: Alec S. Bowman
717 Madison Place N.W.
Washington, D.C. 20439

RECEIVED

APR 1 0 2025

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

